UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------x

RYAN ENGUERRA and FROILEX RAVELAS, on behalf of themselves and all others similarly situated,

Plaintiffs,

-against-

FOOD SYSTEMS UNLIMITED, INC. et al.,

Defendants.

-----------------------------------x

**MEMORANDUM & ORDER**
25-CV-182 (EK)(LGD)

ERIC KOMITEE, United States District Judge:

Plaintiffs Ryan Enguerra and Froilex Ravelas are former employees of a "dual-concept" chain restaurant. The restaurant, which serves Chinese and Japanese food, is called Asian Chao / Fuji Grill and is located at the Roosevelt Field Mall on Long Island. It is owned and operated by defendants China Chao, Inc. and Food Systems Unlimited, Inc., respectively. Enguerra and Ravelas allege that their former employers failed to pay them proper minimum, overtime, and spread-of-hours wages.

Now before the Court is plaintiffs' motion, pursuant to Federal Rule of Civil Procedure 23, for class certification of their New York Labor Law minimum-wage and overtime claim (Count II) and their NYLL spread-of-hours claim (Count III). For the reasons set forth below, plaintiffs' motion is granted

as to their spread-of-hours claim. But the Court declines to certify a minimum-wage and overtime class.

## I. Background

The following facts are drawn from the amended complaint, ECF No. 29, as well as the declarations and exhibits appended to the parties' class certification briefs. Unless otherwise noted, the facts discussed below are undisputed. The Court "only resolve[s] factual disputes to the extent necessary to decide the class certification issue." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 75 (2d Cir. 2015).[1] In so doing, we weigh conflicting evidence to determine whether the "underlying facts . . . relevant to a particular Rule 23 requirement have been established." *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41-42 (2d Cir. 2006).

District courts contemplating class certification have "considerable discretion" to limit discovery and to hold a fact hearing or not. *Id.* at 41. But, before certifying a class, we "must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met." *Id.*

[1] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

## A. Factual Background

### 1. The Parties

At all relevant times, defendant China Chao, Inc. owned the individual restaurant in question — also known as "Store 140" — at the Roosevelt Field Mall on Long Island. Food Sys. Dep. 29:10-30:12, ECF No. 45-2.[2] Defendant Food Systems Unlimited, Inc. operated Store 140 on China Chao's behalf, and the two companies shared a president and CEO — defendant Biagio Schiano. Compl. ¶¶ 29-30; *see also* Food Sys. Dep. 28:20-29:9. Defendant Roy Hui was the District Manager for Store 140 beginning in early 2024, before being promoted to Vice President of Operations for Food Systems Unlimited in mid-2024. Food Sys. Dep. 37:2-18.[3]

Plaintiffs Ryan Enguerra and Froilex Ravelas were two of several Filipino workers hired by defendants in May 2021 to replace the Chinese crew that had previously been working at Store 140. *See* Enguerra Decl. ¶ 2, ECF No. 41-3; Ravelas Decl.

---

[2] It is unclear from the record why the restaurant at the Roosevelt Field Mall was known as Store 140. Food Systems currently manages twenty-one restaurants, many of which include a Chinese "concept" called Asian Chao and / or a Japanese "concept" called Fuji Grill. Food Sys. Dep. 29:16-30:7, 33:18-24. China Chao currently owns one other store; Food Systems' corporate representative did not know how many stores it had owned over the years. 30:20-21, 34:10-16.

[3] Page numbers in citations to briefs and transcripts refer to internal pagination. Page numbers in citations to all other record documents refer to ECF pagination.

¶ 2, ECF No. 41-4.[4] Enguerra testified that he was hired as an assistant manager. Enguerra Dep. 57:24-58:1, ECF No. 45-3. Despite the supervisory title, Enguerra characterized his primary responsibilities as cooking, cleaning, taking inventory, and repairing kitchen equipment. *Id.* at 94:12-95:12; Enguerra Decl. ¶ 3. Ravelas was initially hired as a dishwasher, Ravelas Dep. 31:22-32:3, ECF No. 45-5, but later engaged in other tasks including cooking and serving teriyaki dishes. *Id.* at 55:3-23; Ravelas Decl. ¶ 3. Both were full-time, hourly employees, and both report having worked an average of twenty hours' overtime each week. *See* Enguerra Decl. ¶¶ 4, 12; Ravelas Decl. ¶¶ 4, 16.

Seven other individuals who would be members of the proposed class — Joselito Benitez, Bernie Omana, Francisco Bungag, Maila Niones, Nora Pujol, Eunice Subang, and Miriam Orinion — also submitted declarations in support of class certification. *See* ECF Nos. 41-5 to 41-11. Those declarations appear to have been created from two forms: many paragraphs in the Benitez, Omana, Bungag, and Niones declarations contain identical or near-identical language. The same is true of the Pujol, Subang, and Orinion declarations.

---

[4] Enguerra and Ravelas were still working at Store 140 as of the filing of this lawsuit, but both say they were "forced to quit on February 3, 2025." Enguerra Decl. ¶ 28; Ravelas Decl. ¶ 29. They provide no further details.

2. Defendants' Timekeeping and Payroll Systems

Food Systems' corporate representative testified that employees at Store 140 were always required to clock in and out using the Spot On "point of sales" system. *See* Food Sys. Dep. 57:3-22. And, indeed, plaintiffs acknowledged during their depositions that defendants had such a policy. *See* Enguerra Dep. 62:13-63:7, 72:12-73:5; Ravelas Dep. 71:17-20; *see also* Enguerra Dep. Ex. 9 (policy acknowledgment signed by Enguerra indicating that employees needed to clock out for breaks of thirty minutes or longer); Ravelas Dep. Ex. 7 (same).

If an employee failed to clock in or out, Food Systems had several mechanisms in place to rectify that omission. *First*, "[i]f an employee fail[ed] to clock out after clocking in, the Spot On register system [would] automatically clock them out at 11:55 p.m." Food Sys. Dep. 83:2-7, ECF No. 41-13; *see also* Hui Dep. 141:2-18, ECF No. 45-16. *Second*, any time an employee had to be automatically clocked out — or had forgotten to clock in at all — he was supposed to contact the store's General Manager "to correct the time in the Spot On system." McGowen Decl. ¶ 9, ECF No. 45-19; *see also* Omana Dep. 44:22-45:3, ECF No. 45-11 ("I would just tell [Artes] the following day that I failed to clock out"); Ravelas Dep. 77:10-78:25 (similar). *Finally*, the General Manager could edit the time records as needed when creating payroll. *See* McGowen Decl. ¶ 9.

As the foregoing discussion indicates, the supervisor responsible for ensuring that Store 140's time records were accurate — and that employees clocked in and out daily — was the General Manager. *See, e.g.*, Food Sys. Dep. 57:23-25, ECF No. 45-2. For much (but not all) of the relevant period — from May 2021 to March 2023 and, again, from October 2023 to February 2025 — Roma Artes was the General Manager. *See* Artes Dep. 68:19-21, ECF No. 45-6; Artes Dep. Day 2 at 34:24-35:4, 66:20-67:3, 127:15-20, ECF No. 45-7.[5] She is also Enguerra's wife. *See* Artes Dep. 13:14-18.

At the end of each week, the General Manager would create a payroll summary by "manually transfer[ring] the time from the Spot On system to an Excel file for payroll processing." McGowen Decl. ¶ 9; *see also* Food Sys. Dep. 57:23-58:16. The General Manager would then forward the payroll summary to the District Manager for his review. *Id.* at 58:13-22. Once the District Manager approved payroll, Food Systems would process it through Paychex. *Id.* at 60:9-14.

3. Plaintiffs' Allegations

Plaintiffs, and the other putative class members who submitted declarations, allege that defendants failed to

---

[5] Artes also sued defendants in a separate lawsuit. *See Artes v. Food Systems Unlimited* (25-CV-360). That case was consolidated with the instant action, *see* May 30, 2025 docket order, but *Artes* has since settled via an offer of judgment.

properly compensate them for all the hours they worked. They make several different categories of factual claims in support of this contention.

*First*, plaintiffs contend that defendants did not adequately train certain employees in using the Spot On system. Plaintiffs say that they — and the other Filipino workers who started on the same day — were not shown how to record their hours until their second week of employment. *See, e.g.*, Ravelas Decl. ¶ 6. Because "[t]here was no clocking-in and clocking out of employees' work-hours during the first week of [their] employment," their hours were not "properly counted." *Id.* ¶ 9. Instead, "[a]s far as [Ravelas] was informed" — by whom, he does not say, — it was Food Systems' then-Vice President "Mr. Hinojosa who estimated [his] work-hours" that week. *Id.* And, per Ravelas, Hinojosa underestimated. *Id.*[6]

During their second, third, and fourth weeks on the job, the new employees "were just learning how to clock-in and clock-out [their] hours properly," and "[t]here were times when employees . . . failed to clock-in or clock-out" entirely. *E.g.*, Benitez Decl. ¶ 9. Plaintiffs do not explain why the

---

[6] Several putative class members attested to the same, often in identical or near-identical language. *See* Benitez Decl. ¶¶ 4, 8, ECF No. 41-5; Omana Decl. ¶¶ 4, 8, ECF No. 41-6; Bungag Decl. ¶¶ 5, 8, 13, ECF No. 41-7; Niones ¶¶ 4, 8, ECF No. 41-8. Notably, Bungag quit after that first week. Bungag Decl. ¶ 11.

usual mechanisms of correcting employees' hours were insufficient to address this problem. Instead, they claim that "[a]s far as [they were] informed, it was again Mr. Hinojosa who prepared [their] payroll records, and that it was he who, again, estimated each employee's work-hours to be paid by defendants." Ravelas Decl. ¶ 11; *see also* Benitez Decl. ¶ 10 (using near-identical wording).

Enguerra goes on to claim that, even after Hinojosa "trained and instructed [the Filippino] employees to clock-in and clock-out" during their second week of work, Hinojosa "informed [Enguerra] that [he] did not have to clock-in and / or clock-out." Enguerra Decl. ¶ 6. Later, however, in "mid-2022," Enguerra "realized that [he] was not getting paid for all [his] overtime hours," so he "asked that [he] be allowed to clock-in and clock-out [his] actual work-hours." *Id.* ¶ 15. But even once he began recording his hours, Enguerra says his wife told him "that [his] actual work-hours were not being counted and not being paid properly in the preparation of payroll checks." *Id.*

*Second*, the putative class members allege that the automatic clock-out feature did not work as intended — that "[d]efendants' time record system was defective and failed to accurately reflect employees' clock-in and clock-out times." *E.g.*, Pujol Decl. ¶ 8, ECF No. 41-9; Subang Decl. ¶ 8, ECF No. 41-10 (same). This meant that they were "not getting paid

properly" even after they learned how to use the system. Pujol Decl. ¶ 8; Subang Decl. ¶ 8. They provide specific examples of employees not being clocked out at the end of the day at all. Hui Dep. 141:19-143:13; *see also* Food Sys. Dep. 84:2-20, ECF No. 41-13 (identifying "error in the system" whereby Artes clocked in on May 11, 2021 and appeared not to clock out until 2022). Indeed, putative class member Joselito Benitez noted that defendants' timesheets recorded him as having worked during the months of April, May, June, and July 2022, when in reality he had resigned in March and did not apply to be rehired until November. *See* Benitez Decl. ¶¶ 15-16, 22. Defendants seek to explain these discrepancies partially through employees' failure to correct their own hours and errors on Artes's part, but they also acknowledge that the auto-clock-out function was not enabled for certain employees — "Front Staff" — until May 2023. McGowen Decl. ¶ 7.

*Third*, certain employees claim that they were required to work off-the-clock during their scheduled lunch breaks. *See* Benitez Decl. ¶ 20 ("Oftentimes, I was working even though I was still clocked out supposedly for meal breaks. My employers knew that a lot of the employees were doing this, and yet, allowed us

to continue with this arrangement."); Omana Decl. ¶ 17 (same); Niones Decl. ¶ 17 (same).[7]

*Fourth*, plaintiffs allege — and Defendants concede — that, for much of their tenure at China Chao, employees did not receive spread-of-hours wages. *See* Pls.' Class Cert. Br. 4, ECF No. 41-22; Defs.' Class Cert. Opp'n 4, ECF No. 45. Audrey McGowen, Food System's Director of Administration and Leasing, testified that "it was only sometime in June or July of 2024 that . . . Food Systems came to know about the New York law and spread of hours." Food Sys. Dep. 115:21-25, ECF No. 45-2; *see also* Hui Dep. 118:15-19, ECF No. 41-12 ("[W]e didn't know about . . . the spread of hours law until around May. So ever since May 2024, yes, we were paying the spread of hours."). However, even after learning it needed to pay spread-of-hours wages, Food Systems continued to miscalculate the rate of pay — using the lower state wage rather than the local minimum wage. Food Systems discovered that error in December 2024, at which point it paid plaintiffs backpay to make up the difference. McGowen Dep. 36:24-39:17, ECF No. 45-4.

---

[7] Defendants have raised legitimate questions regarding the admissibility of Niones's declaration. *See* Mot. to Suppl. Mot. to Strike Niones Decl., ECF No. 59-1; *see also* Niones Dep. 104:17-24, ECF No. 59-3 ("Q. And you read [the declaration] before you signed it, correct? A. I read it, but not everything. Q. Did anyone explain it to you? A. No. Q. Did you have a translator that read this to you? A. No."). The Court need not decide that question, however, because it makes no difference to class certification.

*Finally*, plaintiffs contend that, in August 2024 — after Food Systems learned about New York's spread-of-hours law — Hui began directing Artes to shave hours off employees' time records so that it would never appear they worked more than ten hours on a given day. *See, e.g.*, Ravelas Decl. ¶¶ 21-22. Several employees said that they "once saw the Store General Manager editing employee work-hours on the store computer, and on that particular week, [they] did not get compensated for all the hours [they] actually worked." Pujol Decl. ¶ 6; Subang ¶ 7 (identical language); Orinion ¶ 7 (same). Artes told them that it was Hui who had asked her to adjust their hours. *See, e.g.*, Orinion Dep. 65:7-12, ECF No. 45-15.

Artes also complained to McGowen that Hui had asked her to create two sets of records for this purpose. *See* McGowen Dep. 30:5-31:19. But Artes never produced this alleged second set of records as requested. *Id.* at 34:8-23. During this litigation, Artes did produce a set of three text messages in which Hui appears to be asking her to adjust employees' hours improperly. *See* ECF No. 41-19. But defendants also point to Spot On records from the fall of 2024 that show Artes making time adjustments in employees' favor. *See* McGowen Decl. ¶ 12; McGowen Ex. 1, ECF No. 45-20.

**B. Procedural Background**

Plaintiffs filed suit in January 2025, *see* ECF No. 1, bringing (1) minimum-wage and overtime claims under the Fair Labor Standards Act ("FLSA"), Compl. ¶¶ 229-244; (2) minimum-wage and overtime claims under the New York Labor Law ("NYLL"), *id.* ¶¶ 245-250; (3) NYLL spread-of-hours claims, *id.* ¶¶ 251-256; and (4) Trafficking Victims Protection Act claims, *id.* ¶¶ 257-270. Plaintiffs initially indicated that they intended to pursue all those claims — federal and state — on behalf of themselves and others similarly situated, *see id.* ¶¶ 92-106, but they ultimately only sought class certification of their NYLL claims. *See* Oral Arg. Tr. 2:24-4:1, ECF No. 66.[8]

## II. Legal Standard

To obtain class certification, plaintiffs "must satisfy all of the requirements of Rule 23, by a preponderance of the evidence." *Novella v. Westchester Cnty.*, 661 F.3d 128, 148-49 (2d Cir. 2011). They must first meet each of Rule 23(a)'s requirements: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and

[8] Plaintiffs have elected not to pursue conditional certification of an FLSA collective action. *See* Oral Arg. Tr. 4:2-5.

adequately protect the interests of the class." Fed. R. Civ. P. 23(a). In addition, the Second Circuit "recognize[s] an implied requirement of ascertainability" — that is, it must be "feasible for the court to determine whether a particular individual is a member" of the class. *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015).

Plaintiffs must also satisfy Rule 23(b). Here, plaintiffs claim to have done so under Rule 23(b)(3), which requires the Court to find two things: first, "predominance" — that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). And second, "superiority" — "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.*

## III. Discussion

Plaintiffs seek to certify a class of "all hourly-paid restaurant workers employed by Defendants at Store 140 Asian Chao restaurant at the Roosevelt Field Mall in Garden City, New York at any time since January 11, 2019." Pls.' Class Cert. Br. 1. Defendants agree to the certification of a spread-of-hours class — though they argue it should be limited to a narrower date range — and contest only the propriety of certifying a minimum-wage and overtime class. *See* Defs.' Class Cert. Opp'n 2 (proposing to define the class as "all current and former non-

exempt employees of China Chao, Inc., at Store 140 Asian Chao restaurant at the Roosevelt Field Mall in Garden City New York who worked at least one day with spread of hours exceeding 10, from May 11, 2021 through December 20, 2024.”). Given that concession, we treat plaintiffs’ class definition as applying to distinct spread-of-hours and minimum-wage / overtime classes and address each proposed class in turn.

**C. Spread-of-Hours Class**

Even when defendants “do not contest class certification, the Court must still find that the class certification requirements are satisfied.” *Kennedy v. Aegis Media Americas, Inc.*, No. 1:20-CV-03624, 2023 WL 5294132, at *1 (S.D.N.Y. Aug. 17, 2023) (collecting cases); *cf. Denney v. Deutsche Bank AG*, 443 F.3d 253, 270 (2d Cir. 2006) (“Before certification is proper for any purpose — settlement, litigation, or otherwise — a court must ensure that the requirements of Rule 23(a) and (b) have been met.”).

Here, we conclude that those requirements have been satisfied as to plaintiffs’ proposed NYLL spread-of-hours class.

1. <u>Rule 23(a) Factors</u>

Plaintiffs’ proposed spread-of-hours class satisfies each of Rule 23(a)’s requirements.

Using defendants’ timesheets, plaintiffs have identified at least 70 employees who worked more than ten hours

on at least one day between May 11, 2021 and March 30, 2024. *See* List of 70 Identified Employees Eligible to Receive Spread-Of-Hours ("List of Spread-of-Hours Employees") 2-3, ECF No. 41-15. Clearly, then, the putative class members are ascertainable. *See In re Petrobras Sec.*, 862 F.3d 250, 264 (2d Cir. 2017) (ascertainability "requires only that a class be defined using objective criteria that establish a membership with definite boundaries"). And numerosity is presumed when a putative class has at least 40 members. *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).

The commonality and typicality elements are also satisfied. Those "tend to merge into one another," asking, in turn, if "plaintiffs' grievances share a common question of law or of fact" and if "each class member's claim arises from the same course of events" such that "each class member [will] make[] similar legal arguments to prove the defendant's liability." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997). Here, the putative class members' spread-of-hours claims — including the named plaintiffs' claims — all turn on the same central question: whether, as a policy or practice, defendants did not pay the spread-of-hours premium to workers who worked a spread of hours in excess of ten. *See Rivera v. Harvest Bakery Inc.*, 312 F.R.D. 254, 272 (E.D.N.Y. 2016) ("Where, as here, a plaintiff provides proof of a common policy or practice . . . to

underpay its workers, courts frequently find typicality to be satisfied for largely the same reasons that they find commonality to be satisfied.”).

Finally, adequacy is satisfied because “plaintiff[s’] attorneys are qualified, experienced and able to conduct the litigation” and we see no indication that plaintiffs’ “interests are antagonistic to the interest of other members of the class.” *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009); *see* Vinluan Decl. ¶¶ 2-6, ECF No. 41-1 (detailing counsel’s qualifications).

2. Rule 23(b) Factors

The proposed spread-of-hours class also meets Rule 23(b)’s requirements.

The predominance requirement is similar to, but “more stringent” and “far more demanding” than, the commonality requirement. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609, 624 (1997). It is satisfied if “resolution of some of the legal or factual questions that qualify each class member’s case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.” *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013). Here, the common questions are also the overriding ones: whether defendants first learned of New York’s spread-of-hours

law in mid-2024 and, even then, failed to pay spread-of-hours wages to their employees at the correct rate until the end of 2024. Individual plaintiffs will still have to establish that they were eligible for spread-of-hours wages, but they can do so with defendants' own, centralized records. *See* List of Spread-of-Hours Employees. Courts have found predominance easily satisfied under such circumstances. *See, e.g.*, *Mendez v. U.S. Nonwovens Corp.*, 312 F.R.D. 81, 108-09 (E.D.N.Y. 2014) (predominance met because defendants had a uniform "policy prior to this litigation of not compensating employees for spread of hours" and individual questions regarding liability and damages could be decided "mechanically" by referring to defendants' payroll records); *Lewis v. Alert Ambulette Serv. Corp.*, No. 11-CV-442, 2012 WL 170049, at *14 (E.D.N.Y. Jan. 19, 2012) (similar).

A class action is also "superior to other available methods for fairly and efficiently adjudicating the controversy," Fed. R. Civ. P. 23(b)(3), because "individual class members' claims are of relatively low value and there exists a common uniform payroll policy." *Mendez*, 312 F.R.D. at 110; *see also Khalid v. DJ Shirley 1 Inc.*, No. 15-CV-5926, 2018 WL 9963873, at *10 (E.D.N.Y. June 26, 2018) ("From a manageability perspective, one class action to resolve the

straightforward spread of hours issue is clearly preferable to hundreds of individual cases.”).

The Court concludes that the proposed spread-of-hours class satisfies each of Rule 23(a) and (b)’s requirements.

3. Class Period

While the parties agree that the Court should certify a spread-of-hours class, they disagree about the appropriate class period. We agree with plaintiffs that the class period should begin on January 11, 2019 — the earliest date permitted by the NYLL’s statute of limitations.[9] But the class period should end on December 20, 2024.

Defendants argue that the class period should begin on May 11, 2021 since plaintiffs began working for defendants on that date and “have not put forth any evidence of spread of hours violations occurring” earlier. Defs.’ Class Cert. Opp’n 15 n.5. In fact, defendants say, they employed an entirely different crew of workers before that date, with whom plaintiffs never interacted. *See id.* (citing Enguerra Dep. Day 2 at 41:5-12, ECF No. 45-9; Ravelas Dep. 61:10-12, 61:23-62:6). But McGowen — testifying as Food Systems’ corporate representative — made the binding admission that Food Systems was not even aware

[9] Plaintiffs originally filed their complaint on January 11, 2025, *see* ECF No. 1, and the NYLL has a six-year statute of limitations. *See* NYLL §§ 198(3), 663(3).

of New York's spread-of-hours law until mid-2024. *See* Food Sys. Dep. 115:21-25. And defendant Hui testified to the same. *See* Hui Dep. 118:15-19. That being the case, it defies logic to suggest that defendants were paying their employees spread-of-hours wages prior to May 2021. Accordingly, we agree with plaintiffs that the start of the class period should be governed by the statute of limitations.

Defendants are correct, however, that the class period should not run past December 20, 2024. December 20 is the date on which Food Systems admitted the need to adjust prior spread-of-hours pay from $15 to $16, to estimate the plaintiffs' spread-of-hours pay from August to December "[d]ue to a mishandling of worked hours," and to give them backpay accordingly. *See* Enguerra Dep. 198:13-199:11 & Ex. 18; Ravelas Dep. 126:19-25 & Ex. 10. And plaintiffs' counsel conceded during oral argument that, "[p]ost December of 2024," his "clients were not given enough time to be able to be eligible for spread of hours pay." Oral Arg. Tr. 7:16-8:6. Without proof that other employees continued to work shifts longer than ten hours for which they did not receive spread-of-hours pay, plaintiffs have not met their burden of establishing why the class period should run past December 20, 2024.

Accordingly, the Court will certify a class of all current and former non-exempt employees of China Chao, Inc. at

Store 140 at the Roosevelt Field Mall in Garden City, New York who worked at least one day with a spread of hours exceeding ten from January 11, 2019 through December 20, 2024.

**D. Minimum-Wage and Overtime Class**

At the same time, the Court declines to certify plaintiffs' proposed minimum-wage and overtime class. Because the proposed class clearly fails to satisfy commonality and predominance, we need not address Rule 23's other requirements. *See Denney*, 443 F.3d at 270 (class cannot be certified unless each condition of Rule 23 has been met).

1. Commonality

The Supreme Court has held that, to establish commonality, class members' claims "must depend upon a common contention — for example, the assertion of discriminatory bias on the part of the same supervisor." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Commonality "does not mean merely that [class members] have all suffered a violation of the same provision of law"; rather, class members must "have suffered the same *injury*." *Id.* 349-50 (emphasis added).

"In the context of wage-and-hour cases," courts have interpreted *Dukes* to "require movants to either show proof of an express company policy that violates wage and hour laws, or proof from which a court can infer that the defendant operated under a *de facto* policy to deny class members the wages to which

they were entitled." *Fischer v. Gov't Emps. Ins. Co.*, No. 23-CV-2848, 2026 WL 482637, at *7 (E.D.N.Y. Feb. 20, 2026); *see also Mendez*, 312 F.R.D. at 94 ("*Dukes* suggests that in order to demonstrate commonality, the Plaintiff must show, by a preponderance of evidence, that there existed an (i) explicit company-wide policy to encourage class members to work off-the-clock hours without compensating them; or (ii) . . . a *de facto* policy evidenced by significant proof that managers and supervisors uniformly exercised their discretion to deny class members compensation for their work.").

Plaintiffs' proposed NYLL minimum-wage and overtime class fails because they have not identified any policy or practice that is common to the class, defined as all hourly-paid restaurant workers employed by Defendants at Store 140 Asian Chao restaurant at the Roosevelt Field Mall in Garden City, New York at any time since January 11, 2019. *See* Pls.' Class Cert. Br. 1. Instead, they allege that defendants "mandated all different forms of off-the-clock work and time-shaving," without explaining how those "many types of claims . . . can be united by a common question of liability." *Stafford v. Bojangles' Restaurants, Inc*, 123 F.4th 671, 680 (4th Cir. 2024).

*First*, certain employees, who all began working for defendants in May 2021, allege that their hours were undercounted during their first month of employment because they

were not taught how to use the clock in / clock out system correctly. As plaintiffs have articulated it, that claim clearly does not apply to the whole class. *See* Pujol Decl. ¶ 2 (started in August 2021); Orinion Decl. ¶ 2 (started in June 2024); Subang Decl. ¶ 2 (started in August 2024).

*Second*, plaintiffs allege that the Spot On timekeeping system was defective and "failed to accurately reflect employees' clock-in and / or clock-out times." *See, e.g.*, Ravelas Decl. ¶ 18. But they do not explain how the specific examples of timekeeping errors they identify add up to a policy of systematically denying employees their wages. Indeed, in at least one instance, an employee was paid for *more* overtime hours than the timesheets indicated he had worked. *See* Pls.' Class Cert. Br. 8 (citing Food Sys. Dep. 85-86).

*Third*, certain putative class members allege that they were required to work while off-the-clock and during scheduled breaks. *See* Benitez Decl. ¶ 20; Omana Decl. ¶ 17; Niones Decl. ¶ 17; Pujol Decl. ¶ 5; Subang Decl. ¶ 5, Orinion Decl. ¶ 5. But these declarations' "value as proof of a common policy is limited because of the lack of detail" they provide. *Fernandez v. Wells Fargo Bank, N.A.*, No. 12-CV-7193, 2013 WL 4540521, at *8 (S.D.N.Y. Aug. 28, 2013); *see, e.g.*, Pujol Decl. ¶ 5 ("[T]here was at least one or several weeks when I started working for some minutes before I was able to clock-in, and

there was at least one or several weeks when I continued working even though I had already clocked out.”). Furthermore, the named plaintiffs do not attest to having been forced to perform this sort of off-the-clock work, raising both commonality and typicality issues. *See Mendez*, 312 F.R.D. at 98 (finding insufficient evidence of a policy requiring plaintiffs to come in five minutes before their shift because “only four of the eleven declarations relied on by the Plaintiffs even mention that such a policy existed, and those that do refer to such a policy, do so again in a conclusory manner”); *Robidoux v. Celani*, 987 F.2d 931, 936–37 (2d Cir. 1993) (typicality requirement met “[w]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented”).

*Finally*, plaintiffs have presented insufficient evidence that defendants had a *de facto* policy of shaving hours off employees’ time sheets. The texts from Hui to Artes provide some evidence of time-shaving, *see* ECF No. 41-19, but those “three isolated incidents fall well-short of the significant proof required to establish a [store]-wide policy” of improperly deducting employees’ hours. *Mendez*, 312 F.R.D. at 100. Moreover, in one of those instances, Hui simply told Artes to “minus 1 hour and add it to the next day,” which would have had no effect on the employee’s overall number of hours or overtime,

only her spread-of-hours. *See* ECF No. 41-19, at 6. Apart from these text messages, the only real evidence that a time-shaving policy existed is Artes' word, which is significantly undermined by the fact that she did not produce the second set of time sheets Hui supposedly asked her to create. *See* McGowen Dep. 34:8-23.

In *Stafford v. Bojangles' Restaurants*, the Fourth Circuit held that it was an abuse of the district court's discretion to certify a similarly incoherent class. There, "[t]he exact composition of claims and tasks performed varied among prospective class members" and "[n]ot all claimed to have experienced time-shaving adjustments, nor did all claim to have worked off the clock in the same fashion as their peers." 123 F.4th at 677. The court concluded that it was "circular logic for plaintiffs to create a laundry list of factually diverse claims and then assert that these claims, in turn, prove the existence of a uniform company policy." *Id.* at 680.

The same is true here. Indeed, during oral argument, when asked to identify a question of law or fact that is common to the putative class, the best plaintiffs' counsel could offer was "whether or not the members of the class, the plaintiffs as well as the members of the class, were not paid their overtime wages [or] minimum wage." Tr. 9:19-10:1; *see also id.* at 10:19-21 ("The commonality here is that all the plaintiffs as well as

the members of the putative class were not paid properly their wages.”). But failure to pay minimum and / or overtime wages is just plaintiffs’ cause of action. “And [*Dukes*] does not permit commonality on the sole basis that class members ‘all suffered a violation of the same provision of law,’ as this does not ensure that a common answer can address the entire class's claims.” *Stafford*, 123 F.4th at 681.[10]

2. Predominance

Even if plaintiffs had met the commonality requirement, they have still failed to establish that “questions of law or fact common to class members predominate over any questions affecting only individual members.” Fed. R. Civ. P. 23(b)(3).

When determining whether the predominance requirement is met, a court must look to

> (1) the elements of the claims and defenses to be litigated, (2) whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member’s entitlement to relief, and (3) whether the common issues can profitably be tried on a class-wide basis, or whether they will be overwhelmed by individual issues.

[10] Otherwise put, plaintiffs’ counsel seemed to be describing an impermissible “fail-safe” class, which would “require[] a court to decide the merits of individual class members’ claims to determine class membership.” *NYPL v. JP Morgan Chase & Co.*, No. 15-CV-9300, 2022 WL 819771, at *9 (S.D.N.Y. Mar. 18, 2022).

*Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 512 (2d Cir. 2020). While "[t]he fact that damages may have to be ascertained on an individual basis" is not dispositive, it is "one factor" that should be considered in "deciding whether issues susceptible to generalized proof outweigh individual issues." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015).

Here, "individualized proof will be needed to establish each class member's entitlement to relief." *Scott*, 954 F.3d at 512. Because Food Systems' official policy was to require employees to clock in and out — and to require supervisors to correct any inaccuracies of which they became aware before finalizing payroll — "the Court would have to engage in individualized inquiries to determine whether supervisors deviated from those policies." *Mendez*, 312 F.R.D. at 100. Namely, the Court would have to compare class members' testimony regarding the number of hours they recall working to the official time records, and to decide whether their testimony was credible. That testimony goes not only to damages, but also to liability, given the lack of evidence of a uniform policy or practice by which defendants denied class members their wages.

Under such circumstances, individual questions predominate. *See Gregory v. Stewart's Shops Corp.*, No. 14-CV-33, 2016 WL 8290648, at *16 (N.D.N.Y. July 8, 2016)

(predominance not met because liability "would necessarily be determined, not on the basis of payroll or other objective records, but through testimony about deviations from Stewart's Shops express time keeping policies on a store-by-store basis"), *report and recommendation adopted* 2016 WL 5409326 (N.D.N.Y. Sept. 28, 2016); *cf. Enriquez v. Cherry Hill Mkt. Corp.*, 993 F. Supp. 2d 229, 236 (E.D.N.Y. 2013) (predominance and superiority not met as "each class member would have to come forward and establish how many hours he or she worked and how much he or she was paid" to prove liability). The comparative ease with which defendants' liability to individual plaintiffs for failing to pay spread-of-hours wages can be determined merely underscores this point. *See* List of Spread-of-Hours Employees; *see also Flores v. Mission Ceviche, LLC*, No. 24-CV-3626, 2025 WL 2636303, at *11 (S.D.N.Y. Sept. 12, 2025) (finding predominance was met because liability and damages could be determined from "common testimony about tip credit policy and notice and payroll records").

Moreover, the fact that damages will need to be determined based on class members' individual recollections, rather than any set of records, will further contribute to the unprofitability of trying their claims collectively. *See, e.g.*, Benitez Dep. 113:1-25 (testifying to his lack of records), ECF No. 45-13; Bungag Dep. 31:7-10 (same), ECF No. 45-12; Pujol Dep.

124:18-125:5 ("I cannot remember as to which of those times [I worked hours I was not paid for.]"), ECF No. 45-14.

## IV. Conclusion

The Court hereby certifies a class of all current and former non-exempt employees of China Chao, Inc. at Store 140 at the Roosevelt Field Mall in Garden City, New York who worked at least one day with a spread of hours exceeding ten from January 11, 2019 through December 20, 2024. Plaintiffs' counsel is appointed as class counsel. Plaintiffs' motion for class certification is otherwise denied.

The parties are referred to Magistrate Judge Dunst to decide both the appropriate method of providing class notice and whether a third-party administrator is advisable. *See* Defs.' Class Cert. Opp'n 15 (raising the latter issue). Plaintiffs will bear the cost associated with any class notice. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178-79 (1974).

SO ORDERED.

/s/ Eric Komitee
ERIC KOMITEE
United States District Judge

Dated: August 31, 2026
Brooklyn, New York